MARY A. SCHOONMAKER, as Administratrix, etc., of FREDERICK G. SCHOONMAKER, Deceased, Respondent, *v*. PITTSBURGH CONTRACTING COMPANY, Appellant.

Second Department, October 20, 1916.    Reargument, December 8, 1916.

Master and servant — negligence — death caused by electric current — proof justifying recovery — effect of long-continued low voltage shock — appeal — bankruptcy of defendant — refusal of trustee to participate in appeal — evidence.

Action to recover for the death of a workman engaged in blasting in an underground tunnel and who was alleged to have been electrocuted by reason of faulty insulation on an electric light wire which he had been directed to remove from a socket by the defendant's foreman, there being, however, conflicting testimony on this point. Evidence examined, and *held*, that the jury were justified in finding that the decedent had been killed by the electric current although it was claimed not to be dangerous to life owing to low voltage, and that the judgment entered on the verdict, which was the third rendered in favor of the plaintiff, should be affirmed.

*It seems*, that a low voltage current may eventually cause death if the shock be long continued.

The plaintiff in such action is not entitled to a dismissal of the defendant's appeal because, having been adjudged bankrupt, the trustee in

bankruptcy, who was granted leave to intervene and be substituted for the defendant corporation, declined to take part in the appeal.

On reargument:

Where a witness testified on direct examination that the socket from which he released decedent's grasp after his shock was defective, and on cross-examination stated in effect that he noticed the defective socket prior to the time when he loosened decedent's grasp therefrom, a jury may properly find that the socket from which the witness loosened the decedent's grasp was the defective one which he had previously noticed, and not that it was another socket of the cluster of three.

The defect in the insulation of the socket being obvious, as shown by testimony that it could be seen fifteen feet distant, it should have been discovered by the defendant's foreman, charged with the duty of exercising care commensurate with the risks of broken insulation.

The fact that the evidence was not direct or positive did not prevent a just inference of fault from being drawn.

APPEAL by the defendant, Pittsburgh Contracting Company, from a judgment of the Supreme Court in favor of the plaintiff, entered in the office of the clerk of the county of Westchester on the 20th day of January, 1915, upon the verdict of a jury for $10,000, and also from an order entered in said clerk's office on the same day denying defendant's motion for a new trial made upon the minutes.

By motion papers submitted at the argument it appears that since taking this appeal defendant was adjudicated a bankrupt in the District Court for the Southern District of New York on June 23, 1915. After the trustee was elected he was granted leave to intervene and be substituted for the appellant corporation, but the trustee in bankruptcy has declined to take part in this appeal. On this ground plaintiff has moved to dismiss the appeal.

*Paul Grout* [*Charles B. La Voe* with him on the brief], for the appellant.

*Sydney A. Syme,* for the respondent.

PUTNAM, J.:

Plaintiff's intestate met his death in shaft No. 11, a tunnel seventeen feet in height and fourteen feet wide, which defendant was driving in rock near One Hundred and Twenty-first street, in New York, for the new city aqueduct. The tunnel

ran north and south from the shaft entrance or drift. The excavation first takes out the upper part, leaving, somewhat above the intended floor, a bottom which is termed a "bench."

Along the west side of the tunnel were electric lighting wires running from the drift entrance up to the heading, and attached to the side about six or seven feet high from the bottom of the tunnel. Before exploding a blast these wires would be taken down and set back so as to be a safe distance away from the explosion. The wires were disconnected by removing the plugs from the sockets where they are joined on to the wires further back. All of these wires were intended to be insulated so as to permit of being touched without danger.

Along the eastern side of the tunnel ran another wire called the "shooting wire," to carry the current to explode the blasts. To let the current into this wire it was necessary to use a switch kept in a locked box, of which the blaster or foreman alone had the key. No current, therefore, was sent into this shooting wire until the time for actual blasting, when the men were ordered back out of the shaft into the drift, or even above, to the surface.

Compressed air for the drills was conveyed along this tunnel through a three or four-inch iron pipe running about two feet above the bottom of the tunnel. In a previous blast one hole had missed fire, and, therefore, had to be exploded before other drilling. The deceased was employed as a "drill runner" at this heading.

Plaintiff's chief witness was Seay, a colored man, who was a fellow-workman with the intestate. An issue of fact arises between Seay's account and that of Melanify, the defendant's foreman. Seay was on the "bench" some ways back from the heading; there he met deceased coming back. Seay testified that deceased told him, "You go back and stand by the lights and watch them while I go down and see about connecting up the hole," meaning that Seay was to watch the connection of the lighting wires at their sockets to guard "that nobody touched the wires while he was down connecting up." About five or six minutes after that Schoonmaker returned to where Seay was. Seay states that Melanify stood fifteen or twenty feet away on the edge of the drift where it

comes into the tunnel; that Melanify said to deceased: "Hook her up and let her go." Schoonmaker then stood on the compressed air pipe with his hands on the connections of the lighting wire, where three sockets hung down at different points. Schoonmaker asked Seay to hand him the other end of the wire, which Seay did, but it was the dead end. When he screwed this into the socket it lit up all along the line, but the blast did not go. He hollered back to Melanify and said: "I guess she is no good; she don't go." Melanify answered: "Take her out."

It was in the act of unscrewing the plug from this socket that deceased yelled out and his arms were seen to be "crimped up." Seay ran forward and pulled his body off this compressed air pipe. Even then Schoonmaker's hand had not let go. He did not revive, but died in half an hour. Seay testified that he saw on the socket, from which he released deceased's grasp, a bare place or break in the insulation about the size of a nickel five-cent piece.

Melanify admits that he told Schoonmaker to run the wires (the shooting wires) up to the missed hole, and had told him that then they would shoot; but states that he then went away, came to the drift, and went up to the top of the shaft (this seems strange at such a time), but had come down again when he heard deceased's cry, and went forward and found him being supported in the arms of Seay. Melanify denies all the conversation that Seay attributed to him. He also said he examined the sockets right afterward, and states they had no defect of insulation. He admitted that he had then been told that deceased had been shocked on a "bare place" on these sockets.

Defendant also gave evidence of contradictory statements by Seay shortly after the accident; that he then said nothing of what he since attributed to Melanify, and that, two days later, Seay told one Woodbury, a driller in this shaft, that Schoonmaker was carrying a piece of steel which he let come in contact with the wires. Other inconsistent statements by Seay were given.

Appellant argues that with one set of wires specially used to explode the charges, and a different set for lighting, it is improbable that at this occasion the lighting wires would be

pressed into use for blasting. But this was not the ordinary firing where several blasts are simultaneously shot off. Here was but a single hole which had missed. It had to be blown out, otherwise it would leave a danger for the next shift. In possible haste, with the general tendency at times to ignore prescribed precautions, we cannot say that this jury might not rightly credit Seay as against the foreman.

On the issue whether deceased was electrocuted through this contact, defendant urges that the death was from suffocation and not from shock, or, if shock did cause death, it was due to Schoonmaker's diseased condition, by which death ensued from a light current of 220 volts, which to an ordinary man would have been without ill effects.

Here defendant had the medical testimony of Dr. Larkin and the expert opinion of Mr. Charles Z. Southard. Plaintiff had the testimony of Dr. Weston, the coroner's physician, who performed the autopsy on deceased. He describes a mark or spot on the left hand in the softer flesh between the thumb and forefinger. It seared the skin in a dark brown color, but did not destroy the surface. On this issue of the spot, or burn, Dr. Weston is corroborated by the widow, the mother and brother-in-law of Schoonmaker. Dr. Weston testified to opening and examining the brain. But defendant's expert physician, Larkin, denied that the autopsy reached the brain. On these differences the jury could have found the facts that there were an external burn, and internal effects found upon dissection in the heart and lungs, which Dr. Weston observed.

Appellant further contends that from the *indicia* on the body and the current of but 220 volts, the verdict that deceased was electrocuted is against accepted physical facts. Various experiments are cited to show that a far higher voltage was received without harm by many subjects.

In a small volume on electrical injuries it is stated: " There is a wide variety of external and individual conditions that influence the extent of electrical injury; and there is an interdependence of circumstances that make tabulated results and records of accidents apparently inconsistent. At one time 110 volts are involved, and there is a fatal accident; at another 1500 or more, and recovery will ensue. Individual suscepti-

bility is a large factor and the emotions play no inconsiderable role." (Lauffler Electrical Injuries [N. Y. 1912], 12.)

After pointing out that there have been many cases of accidental electrocution "with no demonstrated burns" (p. 15), he refers to an instance of defective insulation of the socket of an ordinary incandescent lamp, that bears considerable analogy to this plight of Schoonmaker.

" Cases are recorded where the ordinary 110 volt cycle lighting circuit proved dangerous. Should the insulation of the socket be defective, in the act of placing an incandescent lamp in the socket, or in turning on the light, a man may come in contact with the circuit and receive a current from the hand to both feet; if he is at the time in a bathtub, his hand being wet and his feet in water, or even if he is standing on a damp grounded floor, the conditions of contact minimize the skin resistance. The shock may be such as to violently flex the muscles of his hands, and render him powerless to release himself. If unassisted he may continue to receive current until death results." (P. 17.)

If the mark or discoloration between the thumb and forefinger indicated where the current entered, the soft skin and numerous local blood vessels there opposed much less skin resistance than in the calloused palms. Deceased had both feet on this iron pipe, which was probably damp. The fatal effect often depends on the continued duration of the contact. Here, after Schoonmaker had been taken off the pipe, his hand was still grasping the socket, from which it had to be knocked loose. It is impossible to say how long was this interval of time between the first contact and this final release.

But it is objected that it was the *right* hand of deceased that held this socket, while the brown mark was on his *left* hand. Hence Mr. Southard drew the inference that this burn may have been caused by the flash when, in separating electric terminals, the current jumps from one to the other, passing into a flame; that the threads of such a socket admit of unscrewing one-half an inch before they become completely severed; that during this unscrewing from the first break up to the half inch gap, this arc might happen, with the burn, even if the socket was perfectly insulated.

Second Department, October, 1916.    [Vol. 176.

This theory, for such it was, was only applicable if the left hand in unscrewing did not touch the socket. But in first separating these parts, the fingers of the left hand which turn the plug also touch and partly cover the socket — or may do so. This flash from an arc light was a possibility, but very remote, since in unscrewing and coupling lights it rarely has occurred. Its rejection by the jury was justified.

The court carefully submitted to the jury this question of Melanify's neglect, instructing them to find if he should have known of this defect in the insulated cover of the socket, and if he knew, or should have known, that decedent might receive substantial injury from the attempt to use this defective socket. Such insulation is so important that its inspection calls for care commensurate with the risk. And the employers of electric current may reasonably be required to have their foremen warned of the perils in exposing the men to the hazards of contacts from absence of insulation, or from small breaks in a part much touched, such as a socket.

It is, however, urged that the finding here involves the logical *lacuna* of "inference upon an inference." The jury were permitted to find, or rather infer, (1) that the foreman had disconnected the lighting wires himself (although he had denied this), and from such act had (2) thereby knowledge of this defective insulation. Here are claimed to be two successive presumptions of fact, in the absence of any direct evidence of such facts.

But these are not distinct inferences. The first — of personally disconnecting the wires — involves not merely turning around the socket and withdrawing therefrom the plug — but the sight or feeling of these parts during this process. Indeed, it would be unnatural and artificial to say that the jury can infer an act, but cannot infer also the subjective elements of this act. An inference of something which is part of the act is not to be treated as separate and independent. This is the doctrine of Greenleaf, that from finding defendant's discharged gun, we infer that he discharged it, also that his bullet killed deceased. (Greenl. Ev. § 14.)

The present verdict is the third rendered in favor of plaintiff. Notwithstanding the cumulative weight of three suc-

cessive verdicts (*Bertolami* v. *United Engineering & Contracting Co.*, 132 App. Div. 804, 820; *Ridgely* v. *Taylor & Co.*, 126 id. 304; *Rice* v. *Cummings Const. Co.*, 169 id. 832) we have not thought it any reason to omit a careful consideration of the trial evidence. (*Eddery* v. *Interborough Rapid Transit Co.*, 172 App. Div. 882.)

I advise that plaintiff's motion to dismiss the appeal be denied, under Code of Civil Procedure (§ 756), and that the judgment and order be affirmed, with costs.

Present — THOMAS, STAPLETON, RICH and PUTNAM, JJ.

Motion to dismiss appeal denied under section 756 of the Code of Civil Procedure, and judgment and order unanimously affirmed, with costs.

On motion by the appellant, Pittsburgh Contracting Company, for a reargument herein:

PUTNAM, J.:

This is on two grounds of alleged mistake in the opinion.

*First.* That the opinion erred in stating that the socket from which the witness Seay released decedent's grasp, after his shock, was the defective socket. This had been stated on the direct examination. The cross-examination of Seay only indicated that the time Seay was loosening this socket from this grasp was not when he had noticed this defect.

" Q. Seay, when this socket and plug were knocked out of Schoonmaker's hand by you, is that when you noticed that there was a piece out of the socket? A. What? Q. When the socket and plug were knocked out of Schoonmaker's hand by you, after he got the shock, that is when you noticed that the piece was knocked out, isn't it? A. No, sir. Q. When was it you noticed that? A. I noticed that when he was connecting it up."

In reconciling the direct and cross-examinations, the jury could properly find that this was the defective socket which Seay had previously noticed, not that it was another and different socket of the cluster.

*Second.* That it was not certainly shown which socket of this cluster the foreman Melanify had previously disconnected.

Hence appellant urges that the foreman could not be charged with neglect without positive proof that he had before actually had this socket in his hand. But these three sockets were hanging together in a small cluster. If Seay, standing fifteen feet off, saw the defect, it could be well found that a foreman, with a duty to take care commensurate with the risks of broken insulation, should have seen what must have been close to his hands when he disconnected any single socket of these three. The defect being obvious, as shown in Seay's testimony, was enough to let the jury infer that this broken insulation should have been discovered by Melanify in the act of disconnecting any of the two associated sockets of this cluster. That this evidence is not direct or positive, did not prevent a just inference of fault to be drawn. (*Bailey* v. *Rome, Watertown & Ogdensburg R. R. Co.*, 139 N. Y. 302, 304.)

The motion for reargument is, therefore, denied.

THOMAS, CARR, STAPLETON and RICH, JJ., concurred.

Motion for reargument denied.